Entered on Docket May 19, 2016

**Below is a Memorandum Decision of the Court.**



_____
**Paul B. Snyder
U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| In re:<br><br>PETTIT OIL COMPANY,<br><br>　　　　　　　　　　Debtor. | **Case No. 13-47285** |
| KATHRYN A. ELLIS, as Trustee for the Bankruptcy Estate of Pettit Oil Company,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>IPC (USA), INC., a California corporation; PETTIT PROPERTIES, INC., a Washington corporation; and KEYBANK NATIONAL ASSOCIATION, a national banking association,<br><br>　　　　　　　　　　Defendants. | **Adversary No. 14-04222**<br><br>**MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT RELATED TO THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS** |

This matter came before the Court on March 30, 2016, on multiple motions for summary judgment. This Memorandum Decision addresses IPC (USA), Inc.'s (IPC) Motion and Notice Thereof for Partial Summary Judgment Dismissing Section 549 Claims Under Trustee's Second Cause of Action for Recovery of Post-Petition Transfers (IPC's Motion, ECF No. 49), and the Trustee's Motion for Partial Summary Judgment for Trustee's Third Cause of Action as it Relates

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 1

**Below is a Memorandum Decision of the Court.**

to the Trustee's 11 U.S.C. § 549[1] Claim (Trustee's Motion, ECF No. 51).[2] IPC's Motion was objected to by the Trustee and KeyBank National Association (KeyBank). The Trustee's Motion was objected to by IPC. After the hearing, the Court took both motions under advisement.

The Court incorporates in its Memorandum Decision the facts set forth in its prior decisions rendered in the Debtor's main bankruptcy case. Following is a brief summary of the facts relevant to this Memorandum Decision.

The Debtor was a distributor of bulk oil, gas, diesel and lubricant products to transportation companies, industrial goods and service producers, logging companies, retailers, agricultural producers, military installations, home customers, counties and other municipalities. On or about September 1, 2013, the Debtor entered into a Consignment & Service Agreement (Consignment Agreement) with IPC. Under the terms of the Consignment Agreement, IPC was to deliver fuel to the Debtor's cardlock facilities to be sold to the Debtor's customers. No signage or other indication was made at the sites to indicate the fuel being sold was on consignment.

Between September 1, 2013, and January 15, 2014, IPC caused regular fuel deliveries to be made to the cardlock sites. The Consignment Agreement provides in Section 3 that IPC was to retain ownership of the fuel being sold at the cardlock sites, and that all fuel sales would be made from IPC to the Debtor's customers. The Consignment Agreement further provides that the Debtor was responsible for maintaining the cardlock sites and accounting records for the fuel sales. The Debtor was to invoice customers monthly and provide instructions for the customers to pay IPC. The Consignment Agreement required the Debtor to promptly forward to IPC any payments that were remitted to the Debtor instead of IPC.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2] Although IPC refers to the § 549 cause of action as the Trustee's second cause of action and the Trustee refers to it as the Trustee's third cause of action, the subject of both motions is the same. As it is the Trustee's complaint, the Court will defer to the Trustee and refer to the § 549 claim as the Trustee's third cause of action.

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 2

As part of the invoicing, the Debtor changed the remittance address on the invoices so that payments from customers on outstanding accounts receivable arising from the consignment fuel sales at the Debtor's cardlock sites would be directed to a Union Bank lockbox in San Francisco (IPC Lockbox) rather than a lockbox established by the Debtor and its primary lender, KeyBank (KeyBank Lockbox). The funds deposited in the IPC Lockbox were swept from the account on a daily basis.

Despite the remittance instructions provided by the Debtor, many of the Debtor's customers continued to send payments to the KeyBank Lockbox instead of the IPC Lockbox. Payment problems also arose when the Debtor's customers purchased fuel from the cardlock sites as well as other petroleum products from the Debtor directly. Rather than differentiating the payments, one payment would be sent to the KeyBank Lockbox covering all of the purchases.

The Debtor filed a voluntary Chapter 11 petition on November 25, 2013 (Petition Date). At the time of filing, there was an unquantified amount of IPC fuel remaining in the tanks at the Debtor's cardlock sites, as well as unpaid accounts receivable for IPC fuel that had been sold and invoiced to the Debtor's customers, accounts receivable outstanding for sales of IPC fuel that had been sold but not yet invoiced to Debtor's customers, and cash in the Debtor's KeyBank Lockbox for sold and invoiced IPC fuel that customers had mistakenly sent to the Debtor instead of to IPC's Lockbox.

Upon filing, KeyBank terminated the Debtor's line of credit and restricted the Debtor's ability to use cash to fund ongoing operations. In order to control the flow of cash, KeyBank set up a debtor-in-possession operating account (DIP Account). Payments sent to the KeyBank Lockbox continued to be deposited into a cash collateral account (Cash Collateral Account). All payments to fund operations were now paid from the DIP Account.

On the Petition Date, the Debtor filed emergency "first day" motions seeking, among other matters, authority to use cash collateral and to pay certain prepetition fuel and lubricant supplier

charges. An emergency hearing was noted for the following day, November 26, 2013. The resulting interim order entered on November 27, 2013 (First Supplier Order), approved payment to those suppliers identified in an attached Exhibit A, including IPC, for product supplied within 20 days of the Petition Date. Also entered on November 27, 2013, was an Interim Order Authorizing Limited Use of Cash Collateral (First Cash Collateral Order). IPC is not a party to or referenced in the First Cash Collateral Order. A Second Interim Order Authorizing Limited Use of Cash Collateral (Second Cash Collateral Order) was entered after a hearing on December 5, 2013, which provides for any "amounts belonging to IPC" to be sent to IPC not later than two banking days after deposit in the Cash Collateral Account, unless an objection is filed. Second Cash Collateral Order 8:3-11, ECF No. 52, Bankr. Case No. 13-47285. A Third Interim Order Authorizing Limited Use of Cash Collateral (Third Cash Collateral Order) was entered on December 19, 2013. The Third Cash Collateral Order provides that the "amount of the Cash Collateral to be used by Debtor in its operations shall not include any amount in the Cash Collateral Account at KeyBank or in the Third Party Banks consisting of funds belonging to IPC." Third Cash Collateral Order 4:20-22, ECF No. 95, Bankr. Case No. 13-47285.

Between the Petition Date and December 19, 2013, there were six transfers from the Debtor's KeyBank accounts to IPC. Between November 26, 2013, and December 19, 2013, IPC received $8,244,987.73, from fuel sales at the cardlock sites. Documents produced by IPC indicate that as of December 19, 2013, there was $1,236,505 in inventory in the fuel tanks at the cardlock sites that continued to generate accounts receivables. The accounts receivables generated from this inventory were either (1) paid by customers directly to the IPC Lockbox, (2) paid by customers to the KeyBank Lockbox and remitted to IPC, or (3) paid to the KeyBank Lockbox and retained by KeyBank.

The Debtor's Chapter 11 case was converted to Chapter 7 on January 17, 2014, and a Trustee was appointed. On February 13, 2014, IPC filed a Motion for Relief from Stay to collect

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 4

its accounts receivable and inventory. After hearings held on March 6 and April 10, 2014, the Court rendered an Oral Decision and entered an order on April 15, 2014, determining that the Trustee was "estopped from challenging IPC's interest in the proceeds, inventory or accounts receivable generated from fuel delivered to the Debtor after December 19, 2013." Order on Estoppel Issue and Denying IPC's Motion for Relief from Stay 1:22-24, ECF No. 580, Bankr. Case No. 13-47285.

On August 27, 2014, the Trustee filed the current adversary proceeding asserting claims against IPC, Pettit Properties, Inc., and KeyBank, as amended by stipulation filed February 6, 2015. Multiple motions for summary judgment were heard by the Court on March 30, 2016. This Memorandum Decision addresses the motions filed by the Trustee and IPC as they relate to the Trustee's § 549 causes of action.

Section 549(a) provides:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate ---
>     (1) that occurs after the commencement of the case; and
>     (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or
>         (B) that is not authorized under this title or by the court.

As an initial matter, clarification is necessary as to what transfers the Trustee is seeking to recover under § 549. It is undisputed that two categories of postpetition transfers occurred. One involves payments made by the Debtor to IPC for the Debtor's own fuel purchases and the other involves payments made pursuant to the terms of the parties' Consignment Agreement. The Trustee clarified in her pleadings and at the March 30, 2016 hearing that she is not seeking to recover any payments made to IPC for the Debtor's own fuel purchases. The Trustee's § 549 claim relates solely to the postpetition transfer of estate assets pursuant to the Consignment Agreement.

Within the category of transfers by the Debtor to IPC pursuant to the Consignment Agreement there are additional multiple layers of transfers. The Court has spent considerable

time in attempting to determine precisely what transfers are at issue, which is made more difficult by the fact that the parties do not appear to agree. Although both the Trustee and IPC have moved for summary judgment on the Trustee's § 549 claim, these are not cross-motions for summary judgment as the relief sought by the Trustee is broader than that addressed by IPC. IPC's motion appears to limit its arguments to the six postpetition transfers to IPC from the Debtor's KeyBank accounts, while the Trustee seeks to avoid all postpetition transfers to IPC related to the Consignment Agreement.

### 1. Property of the Estate

Pursuant to § 549, the Trustee may only avoid postpetition transfers of "property of the estate." IPC argues that the Trustee cannot avoid the postpetition transfers pursuant to § 549 because the sales proceeds of the petroleum products never became property of the estate.

Property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(a)(1). The existence and nature of a debtor's interest in property is determined by nonbankruptcy law. See Butner v. United States, 440 U.S. 48, 55 (1979).

The Consignment Agreement provides in Section 19 that it is governed by California law. At the March 30, 2016 hearing, IPC conceded that the Consignment Agreement is a "true" consignment agreement as defined in Cal. Com. Code § 9102(a)(20) (West 2014). IPC has also admitted that it did not file a UCC-1 financing statement and its interest is therefore unperfected.

In support of her position, the Trustee relies on Cal. Com. Code § 9319(a) (West 2001), which provides:

> (a) Except as otherwise provided in subsection (b), for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer.

Based on this language, the Trustee argues that all fuel inventory delivered by IPC to the Debtor's cardlock sites, and all accounts receivable and proceeds from the sale of that inventory, became property of the estate under California law, whether in the possession of IPC, KeyBank or the Debtor.

IPC disagrees arguing that Cal. Com. Code § 9319(a) applies as to third party creditors and does not resolve the property of estate issue because it does not affect title between the consignor (IPC) and consignee (Debtor). According to IPC, as between IPC and the Debtor, title to the consigned goods remained with IPC even if unperfected. The only difference is that creditors of the Debtor, such as KeyBank and possibly the Trustee under § 544, could potentially acquire judicial liens and security interests in the goods with priority over IPC.

The Trustee does not disagree that title to the fuel inventory remained with IPC postpetition. It is undisputed that the Consignment Agreement provides that title to inventory and proceeds remains with IPC. As between the Debtor and IPC, therefore, IPC retained title to and ownership of the inventory and proceeds, even after the Debtor filed bankruptcy, and even though IPC failed to properly perfect its interest. The Trustee, however, argues that title and ownership are irrelevant to the analysis of whether such inventory, and proceeds that flowed from such inventory, became property of the estate.

Both parties have cited multiple cases in support of their positions. None of these cases, however, are on point.

The Trustee relies on the case of North Star Diamond Co. v. Brusich & St. Pedro Jewelers, Inc. (In re Brusich & St. Pedro Jewelers, Inc.), 28 B.R. 545 (Bankr. E.D. Pa. 1983), in which a creditor delivered eight pieces of jewelry to the debtor prepetition for sale in the debtor's jewelry business. When the debtor filed bankruptcy, the creditor sought relief from stay to recover the jewelry alleging that the debtor lacked title and ownership in the jewelry. The bankruptcy court examined the transaction under the then-applicable Pennsylvania Commercial

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 7

Code (P.C.C.) governing consignments, specifically P.C.C. § 2326, and determined that the jewelry was subject to the claims of the debtor's creditors because the creditor (1) had not complied with applicable post-signing statutes; (2) the debtor was not generally known by his creditors to be dealing in the goods of others; or (3) the creditor had failed to comply with the filing provisions of Article 9. Brusich, 28 B.R. at 548. The Trustee argues that as in Brusich, the inventory, accounts receivable and cash proceeds arising from the sale of consigned fuel delivered to the Debtor's cardlock sites after the petition date constitute property of the estate under § 541 because IPC also failed to file a UCC-1 financing statement to protect its interest and cannot establish that the Debtor was generally known by its creditors to be substantially engaged in selling the good of others.

This argument, however, fails to accurately distinguish between the facts of Brusich and those currently before this Court. In Brusich, the property at issue was delivered prepetition. At issue in these motions for summary judgment is whether the Trustee's § 549 claims are limited because the transfers of funds were derived from petroleum product delivered postpetition. By its terms, property of the estate under § 541(a)(1), includes all legal and equitable interests of the debtor in property as of the commencement of the case (emphasis added). Brusich does not answer the question of whether such product delivered postpetition and any proceeds that are generated therefrom also constitute property of the estate.

The same is true of the other cases cited by both the Trustee and IPC. For instance, IPC relies heavily on the case of In re Valley Media, Inc., 279 B.R. 105 (Bankr. D. Del. 2002). In the Valley Media case, the bankruptcy court addressed whether an inventory vendor was entitled to relief from stay to recover consigned inventory that was again held by a chapter 11 debtor on the petition date. Recognizing that "[n]either the application of former U.C.C. § 2-326(3) or revised U.C.C. § 9-319(a) affects the ownership rights of the consignor in relation to the consignee," the court denied relief from stay due to the debtor-in-possession's strong-arm powers under § 544.

Valley Media, 279 B.R. at 132-133. Again, this case has limited application to the Trustee's § 549 claims as the property at issue was delivered postpetition rendering § 544 inapplicable. The same is true of In re Whitehall Jewelers Holdings, Inc., 2008 WL 2951974 (Bankr. D. Del. 2008), and Messer v. Peykar Int'l Co. (In re Fine Diamonds, LLC), 501 B.R. 159 (Bankr. S.D.N.Y. 2013), both of which involved goods that were consigned prepetition, by the debtor as consignee in Whitehall and as consignor in Fine Diamonds.

Neither party has cited to any case where a court examined whether consigned goods delivered postpetition by an unperfected creditor became property of the estate. For purposes of the instant § 549 claims, the Court is only addressing the Trustee's ability to avoid postpetition transfers of estate property. Although many of the cases cited may be relevant to the § 544 claims, none of the cases cited directly address the issue of whether the Debtor acquired an interest in the fuel delivered after the Petition Date, or the proceeds and/or accounts receivable generated from fuel delivered after the Petition Date, sufficient to render it property of the estate; particularly in a case such as this where the Trustee admits that title remained with IPC. The Trustee cannot utilize § 544, because the Trustee's § 544 powers "are limited by their terms and may not be used to avoid postpetition transfers." 5 L. King, Collier on Bankruptcy 544.01, p. 544-4 (16th ed. rev. 2014). How then does the Debtor acquire an interest in consigned property, delivered postpetition, that renders it estate property?

The answer may be that the analysis will be the same for property delivered as of the petition date or postpetition by virtue of § 541(a)(7), but neither party has provided sufficient analysis or authority for the Court to render a decision on this issue at this time. The issue in this case may be further complicated by the fact that the product was delivered postpetition pursuant to a prepetition agreement.

The burden is on the party moving for summary judgment to establish that summary judgment should be granted in its favor. The Court is unable to render a decision as a matter of

law based on what has been presented and is reluctant to delve into its own analysis without briefing on this specific issue from the parties.

Accordingly, the Court will reserve ruling on whether the fuel delivered postpetition pursuant to an unperfected Consignment Agreement, including any proceeds or accounts receivable generated therefrom, became property of the estate. Both the Trustee's motion and IPC's motion for partial summary judgment are therefore denied, without prejudice.

In addition to the property of the estate issue, the parties also argued and briefed the issue of whether these transfers were authorized by the court under § 549(a)(2)(B) and/or in the ordinary course of business under § 363(c). Recognizing that this may be an advisory opinion if it is ultimately determined that there was not a transfer of estate property, the Court, however, will address these arguments out of judicial economy and in an effort to limit what remains to be decided either prior to or at trial.

### 2. Authorized by the Court

Both parties have moved for summary judgment on the issue of whether the postpetition transfers at issue were "authorized . . . by the court" for purposes of § 549(a)(2)(B) and therefore not avoidable. The burden is on IPC to prove by a preponderance of the evidence that the payments at issue were authorized by the Court. See 11 U.S.C. § 549; Fed. R. Bankr. P. 6001; see also Malloy v. St. John Medical Center (In re Woodward), 234 B.R. 519, 523 (Bankr. N.D. Okla. 1999).

As an initial matter, the Trustee is correct that even if IPC prevails on this argument, it would not insulate it as to all of the transfers the Trustee seeks to avoid. For instance, IPC argues that the transfers were authorized by the Second Cash Collateral Order entered on December 5, 2013. If true, transfers, if any, occurring between the Petition Date and December 5, 2013, would not be covered, as such transfers occurred prior to entry of the Second Cash Collateral Order.

In its previous motion for summary judgment filed on January 27, 2016, IPC argued that the transfers at issue were specifically authorized by the First Supplier Order entered on November 27, 2013. The evidence presented, however, fails to establish that the First Supplier Order authorized payment to IPC pursuant to the Consignment Agreement as alleged.

There is not a single reference to the Consignment Agreement in the First Supplier Order, or any language to indicate that the Debtor's relationship with IPC pursuant to that agreement is covered by its provisions. The First Supplier Order instead provides that the "Debtor is hereby authorized, but not required, to enter into agreements with Suppliers for purchase (sic) petroleum products on terms and conditions agreed to with each Supplier (the "Post-Petition Purchases"), which purchases are necessary for Debtor to continue its business, and to issue post-petition checks in payment therefor". First Supplier Order 3:12-16, ECF No. 26, Bankr. Case No. 13-47285. The plain language of the First Supplier Order indicates that the only agreements being authorized are those pursuant to which the Debtor would purchase petroleum products from the identified fuel suppliers. Although IPC is an identified fuel supplier, this is only because IPC had a fuel supply relationship with the Debtor in addition to the consignment relationship. The parties agree that the First Supplier Order authorized payments to IPC for fuel supplied to the Debtor. There is no evidence to suggest, however, that the First Supplier Order also included payments to IPC pursuant to the Consignment Agreement. There is also no evidence that the Court was even aware of the Consignment Agreement when the First Supplier Order was entered. The First Supplier Order was entered on November 27, 2013, yet all parties appear to concede that the Court was first made aware of the existence of the Consignment Agreement by counsel for IPC at the December 5, 2013 hearing.

IPC conceded at oral argument on March 30, 2016, that this was a true Consignment Agreement. As a consignee, the Debtor was therefore not purchasing products from IPC under the Consignment Agreement, and as a consignor, IPC cannot argue that it was a "Supplier."

**Below is a Memorandum Decision of the Court.**

This is true even if unperfected. Although a creative argument, IPC's failure to perfect does not transform IPC into a "Supplier" for purposes of these transfers. The only purchases by the Debtor from IPC intended to be covered by the First Supplier Order are the purchases of fuel on behalf of the Debtor. Taking all inferences in IPC's favor, it is not reasonable to conclude that the transfers at issue in either of the relevant motions for summary judgment were authorized by the Court in the First Supplier Order.

IPC next argues that the transfers were authorized by the Second Cash Collateral Order entered on December 5, 2013. Section 7 on the Second Cash Collateral Order provides in part:

> Any amounts belonging to IPC, contained in the Cash Collateral Account, shall be sent to IPC not later than two (2) banking days after deposit in cash collateral account, provided that with regard to the funds presently in the Cash Collateral Account belonging to IPC, such funds shall be disbursed to IPC no later than December 9, 2013. If the Secured Creditors object to a portion of such funds being disbursed to IPC because they do not believe such funds are owned by IPC, the portion subject to such objection shall be withheld and the matter set for hearing within 2 days subject to court availability.

Second Cash Collateral Order 8:3-11, ECF No. 52, Bankr. Case No. 13-47285.

The term "Secured Creditors" is defined as KeyBank and EMAC Trust. Second Cash Collateral Order 2:16-17, ECF No. 52, Bankr. Case No. 13-47285. An objection to disbursements to IPC was filed by KeyBank on December 9, 2013. The docket indicates that KeyBank withdrew its objection on December 10, 2013.

The Court disagrees with IPC that the transfers at issue were authorized by the Court for purposes of § 549 by the Second Cash Collateral Order. Not only is the Second Cash Collateral Order also void of any language or reference to the Consignment Agreement, but it fails to constitute court authorization of the transfers at issue.

By its plain terms, Section 7 of the Second Cash Collateral Order allowed funds "belonging to IPC" to be disbursed absent any objections from secured creditors. It is undisputed that as of the date of entry of this order, it was at issue whether any funds belonged to IPC.

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 12

Presumably this is why KeyBank filed an objection to payment on December 9, 2013. Although this objection was later withdrawn and an agreement was later reached among the parties as to IPC's entitlement to these funds, a comprehensive agreement was not reached until after entry of the Second Cash Collateral Order. Such agreement was then incorporated into and approved by the Court in the Third Cash Collateral Order, that was entered on December 19, 2013.

Unlike the Second Cash Collateral Order, the Third Cash Collateral Order contains specific language stating as follows:

> The Debtor and Key Bank agree that fuel held in those tanks under the Consignment Agreement is not property of the Debtor, and neither the Debtor nor the Key Bank have any rights related to that fuel or the accounts receivable arising [from] that fuel or the accounts receivable arising therefrom [sic].

Third Cash Collateral Order 6:3-7, ECF No. 95, Bankr. Case No. 13-47285.

This provision is contained in the "ordered" portion of the Third Cash Collateral Order, pursuant to which the Court approved the parties' agreement as to their rights vis-a-vis IPC. Subsequent to the Second Cash Collateral Order, these rights were still at issue, and it was not until entry of the Third Cash Collateral Order that they were resolved among the parties and their agreement was approved by the Court.

Such a conclusion is consistent with the Court's prior ruling on IPC's Motion for Relief from Stay. The Court determined that based on the above language in the Third Cash Collateral Order, the Trustee was "estopped from challenging IPC's interest in the proceeds, inventory or accounts receivable generated from fuel delivered to the Debtor after December 19, 2013." Order on Estoppel Issue and Denying IPC's Motion for Relief from Stay 1:22-24, ECF No. 580, Bankr. Case No. 13-47285. The Court ruled that estoppel applied from this point forward, rather than an earlier date, precisely because:

> Although there may have been discussions and emails between the parties prior to that date and some language regarding IPC was included in the Second Interim Cash Collateral Order, KeyBank raised its objection to disbursements to IPC subsequent to that order and it was not until December 19, 2013, that the parties

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 13

memorialized their apparent agreement regarding IPC's treatment and <u>their agreement was approved by the Court</u>. (emphasis added).

Digital recording of Oral Decision rendered April 15, 2014, 9:15:46-9:16:16 AM, Bankr. Case No. 13-47285.

Although the Court determined that the Trustee could not challenge IPC's rights from December 19, 2013 forward based on an estoppel theory, the findings that supported that determination are also relevant to the § 549 claim. Estoppel was appropriate because it was justifiable for IPC to rely upon the parties' agreement in the Third and Fourth Cash Collateral Orders to not challenge that any fuel supplied by IPC or proceeds therefrom were not property of the estate, which agreement was also approved by the Court. As stated previously, the Court specifically analyzed whether estoppel should apply earlier than December 19, 2013, and determined that it should not, precisely because the parties did not agree to the effect of the Consignment Agreement, nor did the Court approve such agreement until December 19, 2013. Although IPC has indicated that it is not arguing estoppel in defense of the § 549 claim, to now accept IPC's position that court approval occurred prior to December 19, 2013, contradicts the Court's prior findings.

Additionally, the Court did not determine that the Trustee was prohibited from challenging IPC's rights to proceeds, inventory or accounts receivables provided or generated from fuel delivered after December 19, 2013, because such transfers were "authorized" by the Court in the Third Cash Collateral Order. Rather, the Trustee was prohibited from challenging such transfers due to estoppel. It is the Court's opinion that unlike in <u>Grede</u>, what the Court was approving in the Third Cash Collateral Order was the parties' agreement as to what was property of the estate, as opposed to the Court authorizing any transfers for purposes of § 549. Compare <u>Grede v. FCStone, LLC</u>, 746 F.3d 244, 254-55 (7th Cir. 2004) (where the debtor asked the court for an emergency order allowing funds to be disbursed and the court entered an order specifically

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 14

approving the transfer). It was not the Court's intent to authorize such transfers for purposes of § 549 in either the Second or Third Cash Collateral Order, nor was such authorization requested by the parties. The Court also recognizes that the effect of the Third Cash Collateral Order, however, is not at issue in this decision. The issue currently addressed by the Court is whether the transfers at issue were authorized by the Second Cash Collateral Order. All parties agreed at the hearing that this issue was appropriate for resolution on summary judgment, and the Court concludes that Trustee has established as a matter of law that the Court did not authorize the postpetition transfers to IPC in either the First Supplier Order or the Second Cash Collateral Order.

In addition and as previously indicated, even assuming the Court were to find that transfers were authorized by the Second Cash Collateral Order, the Trustee is correct that such a finding would be insufficient to dismiss the Trustee's entire § 549 claim. The Second Cash Collateral Order only dealt with funds in the Cash Collateral Account. It did not address the additional transfers at issue that were not paid out of this account. According to the Trustee, such additional transfers include (1) accounts receivable to IPC, (2) accounts receivable proceeds to IPC from fuel sales at the Debtor's cardlock sites that were not deposited into the KeyBank Lockbox Account, and (3) inventory that existed as of the petition date that was subsequently sold to customers, generating accounts receivable that were transferred to IPC and thereafter paid to and received by IPC. As the Court has determined that no postpetition transfers were authorized by the Court for purposes of § 549, it is not necessary for the Court to determine what transfers, if any, would have been protected.

IPC's motion for partial summary judgment dismissing the Trustee's § 549 claims as authorized by the Court is denied, and the Trustee's motion is granted.

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 15

**Below is a Memorandum Decision of the Court.**

### 3. Ordinary Course of Business

IPC also argues that the Trustee's § 549 claims should be dismissed because the transaction was in the ordinary course of business and thus not subject to avoidance.

Although IPC referenced both § 547(c) and § 363(c) in regards to ordinary course in its pleadings, only § 363(c) is applicable as a defense to a § 549 claim. As for the applicability of this defense to the current motions, although IPC originally indicated in its motion that it was not seeking summary judgment on § 363(c),[3] its subsequent actions in briefing and arguing this issue indicate that it is requesting a ruling from the Court. Both the Trustee and KeyBank have responded to this defense. Accordingly, the Court will address this issue.

Under § 363(c)(1), "[i]f the business of the debtor is authorized by to be operated under . . . this title and unless the court orders otherwise, the trustee may enter into transactions . . . in the ordinary course of business, without notice or a hearing." A determination of whether a transaction falls within "the ordinary course of business is a question of fact that depends on the nature of industry practice." Anderson v. Ganis Credit Corp. (In re Jan Weilert RV, Inc.), 315 F.3d 1192, 1196 (9th Cir. 2003).

Two tests have emerged for determining whether a transaction is in the ordinary course of business. These tests are commonly referred to as the horizontal test and the vertical test. The Ninth Circuit Court of Appeals (Ninth Circuit) has determined that a transaction that meets both tests is in the ordinary course of business. In re Straightline Invs., Inc., 525 F.3d 870, 879 (9th Cir. 2008).

The horizontal test asks "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 704 (9th Cir. 1988). IPC submitted the declaration and report of Mr. Brewer in support of its ordinary course of business defense. Mr. Brewer states

---

[3] See IPC's Motion 3 n.1, ECF No. 49.

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 16

in his declaration that "it is my professional opinion, to a reasonable scientific certainty, that consignment-type arrangements, similar to that set out in the [Consignment Agreement] … are neither unusual nor aberrational in the petroleum distribution industry" and that they are "common and ordinary in the petroleum distribution industry." Brewer Decl. 2:4-10, ECF No. 58. Mr. Brewer's opinion is supported by his report, which has not been contradicted. In addition, IPC has since conceded that the Consignment Agreement is a "true" consignment agreement thus resolving the Trustee's concerns about inconsistent arguments.

The vertical test examines whether the "disputed transaction 'from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.'" Straightline, 525 F.3d at 879 (quoting Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 705 (9th Cir. 1988)). Courts typically look to the debtor's prepetition practices to determine whether the transaction meets the vertical test.

IPC has provided little argument or evidence to establish the vertical test. The only argument made by IPC to support the vertical test is the statement that the payments made prepetition are consistent with the payments made postpetition. This statement is supported by the Takeuchi declaration filed in support, including Exhibits A-1 and A-2, which list all prepetition and postpetition payments made by the Debtor to IPC for fuel lifted from the cardlock facilities by date and amount. See Takeuchi Decl., ECF No. 50. The evidence, however, is insufficient to establish that the vertical test has been established as a matter of law.

The Court agrees with the Trustee and KeyBank that in accordance with Straightline and Dant & Russell, the risks faced by creditors must be analyzed in determining whether the vertical test has been met. The Trustee has set forth specific evidence detailing the risks placed on creditors postpetition by the Consignment Agreement. IPC has failed to provide sufficient

**Below is a Memorandum Decision of the Court.**

evidence, if any, to refute this evidence preventing any grant of summary judgment in its favor.

IPC's motion for summary judgment under § 363(c) is denied.

///End of Memorandum Decision///

MEMORANDUM DECISION ON MOTIONS
FOR SUMMARY JUDGMENT RELATED TO
THE TRUSTEE'S 11 U.S.C. § 549 CLAIMS - 18